**Barry J. SCHWARTZ, As the Trustee of the Bankruptcy Estate of John and Carol Dubravetz, John Dubravetz, Carol Dubravetz, Plaintiffs–Appellants,**

v.

**PILLSBURY INC., HDF Liquidating Corp., Doris Mattus Hurley, Haagen Dazs Shoppes Co. Inc., et al., Defendants–Appellees.**

No. 91–55684.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 4, 1992.

Decided July 22, 1992.

Dennis G. Martin, Ashen, Martin, Seldon, Lippman & Scillieri, Los Angeles, Cal., for plaintiffs-appellants.

Craig E. Stewart, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.

Before D.W. NELSON, BOOCHEVER and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

## OVERVIEW

John and Carol Dubravetz bought a Haagen Dazs ice cream shop franchise from Haagen Dazs Franchise, Inc., a New York corporation. The venture failed, and the Dubravetzes filed a petition in bankruptcy. They and the trustee of their bankruptcy estate then sued, among others, Haagen Dazs, its former president Doris Mattus Hurley, and Pillsbury, Inc., which acquired Haagen Dazs after the Du-

bravetzes bought their franchise.[1] The Dubravetzes alleged claims for violation of RICO, violation of the New York Franchise Sales Act, breach of contract and fraud, all growing out of the purchase of their Haagen Dazs franchise.

The district court granted summary judgment in favor of all defendants except HDF Liquidating Corp., formerly known as Haagen Dazs Franchise, Inc. The court entered an order under Rule 54(b) of the Federal Rules of Civil Procedure and directed entry of a final judgment in favor of all defendants except HDF Liquidating Corp. The Dubravetzes contend HDF Liquidating Corp. has no assets. This appeal followed.

As a result of the district court's Rule 54(b) certification, we have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's summary judgment in favor of Hurley on the Dubravetzes' fraud claim, because there are genuine issues of material fact as to her liability for misrepresentations and omissions upon which the Dubravetzes contend they relied when they bought their franchise. We also reverse the district court's summary judgment in favor of Hurley on the Dubravetzes' claim under the New York Franchise Sales Act, because the contract by which the Dubravetzes bought their Haagen Dazs franchise provides that it is "deemed" to have been made in New York, and the New York Franchise Sales Act applies to franchise agreements made in that state. We affirm the district court's summary judgment in favor of the Pillsbury defendants on the Dubravetzes' fraud and New York Franchise Sales Act claims, because the Pillsbury defendants are not liable on these claims as successors to Haagen Dazs, and successor liability was the basis on which these claims were asserted against them. We affirm the district court's summary judgment in favor of all defendants on the breach-of-contract claim. The Dubravetzes do not appeal the district court's summary judgment on the RICO claim.

## FACTS

In 1982, the Dubravetzes met with Haagen Dazs vice president Carl Paley to discuss the possibility of buying a Haagen Dazs franchise to operate an ice cream shop in the Thousand Oaks Mall in Thousand Oaks, California. According to the Dubravetzes, Paley made a number of false representations, both orally and in writing, concerning the financial performance of other franchise locations and the costs associated with starting up a franchise. . Hurley attended part of a meeting between John Dubravetz and Paley at which Hurley stated her belief that the Thousand Oaks Mall would be a good or profitable location for a Haagen Dazs franchise shop.

The Dubravetzes bought the franchise, and in August 1983 they opened their ice cream shop. They encountered financial difficulties from the beginning. Start-up costs were greater than anticipated and sales were low. The venture was a failure. The Dubravetzes filed a petition in bankruptcy in November 1985, and in January 1986 the store was closed. They filed this lawsuit in the United States District Court for the Central District of California in April 1989.

## DISCUSSION

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Summary judgment is proper if no genuine, material factual issue exists for trial. The party opposing summary judgment "must demonstrate that the fact in contention is material, *i.e.,* a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.,* the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lindahl v. Air*

1. The plaintiffs, all of whom we sometimes refer to as "the Dubravetzes," also sued two Pillsbury, Inc. subsidiaries. We sometimes refer to all the Pillsbury defendants as "Pillsbury."

*France*, 930 F.2d 1434, 1436–37 (9th Cir. 1991).

## B. Defendant Hurley

■ The Dubravetzes argue they have presented a genuine issue of material fact regarding Hurley's participation in the alleged fraudulent misrepresentations and omissions on which they contend they relied when they bought their franchise. We agree.

■ Under California law, which the parties do not dispute applies to this claim, directors and officers of a corporation do not incur personal liability for the torts of the corporation "unless they participate in the wrong or authorize or direct that it be done." *United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.*, 1 Cal.3d 586, 83 Cal.Rptr. 418, 423, 463 P.2d 770, 775 (1970). *See also Frances T. v. Village Green Owners Ass'n*, 42 Cal.3d 490, 229 Cal.Rptr. 456, 463, 723 P.2d 573, 580 (1986); *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773, 157 Cal.Rptr. 392, 399, 598 P.2d 45, 52 (1979). "Personal liability, if otherwise justified, may rest upon a 'conspiracy' among the officers and directors to injure third parties through the corporation." *Wyatt*, 157 Cal. Rptr. at 399, 598 P.2d at 52.

The district court determined that there were five alleged misrepresentations and omissions on which the Dubravetzes were entitled to go to trial against HDF Liquidating Corp.:

1. That the average California Haagen Dazs franchised ice cream shop had annual gross sales well over $300,000, when in fact the average was well below that amount.

2. That *no* California Haagen Dazs franchised ice cream shop had annual gross sales of less than $300,000, when in fact many did.

3. That the Dubravetzes should experience better than average gross sales at their Thousand Oaks, California location, when in fact Haagen Dazs's director of real estate had previously rejected a franchise applicant for that location because the location could not be expected to generate annual gross sales in excess of $200,000 to $225,000.

4. That the net profit percentages for a Haagen Dazs franchised ice cream shop varied between 21 and 27 percent, when in fact Haagen Dazs did not have information as to the profitability of its franchises.

5. That the Haagen Dazs offering circular estimated the costs of opening a franchised ice cream shop at between $55,000 and $105,000, and that its vice president Paley told John Dubravetz that his shop would come in at the low end of this range, when in fact Haagen Dazs did not know the amount of construction costs associated with opening a franchised ice cream shop, and the Dubravetzes spent $175,000 to open their shop.

The Dubravetzes contend that Hurley participated in, directed or authorized these alleged misrepresentations and omissions. They point to evidence that Hurley was Haagen Dazs's president and was involved in the day-to-day running of the business; she routinely swore to the truth of franchise offering circulars, which contained false information regarding start-up costs; she was quoted in a *Businessweek* article as stating that average sales at the Haagen Dazs ice cream shops were $300,000 per year; she knew that Paley made representations to potential franchisees as to the earnings of franchised shops when she knew Haagen Dazs had no data to support representations of earnings; and she assisted in developing an overall average cost figure to open a franchised shop based solely upon data from her own profitable eight Haagen Dazs ice cream shops.

Some of this evidence is insufficient to create a genuine issue of material fact as to Hurley's liability for the alleged misrepresentations and omissions. That Hurley was Haagen Dazs's president is insufficient by itself to establish her liability. *See Haidinger–Hayes*, 83 Cal.Rptr. at 423, 463 P.2d at 775. Nor does the mere fact that Hurley was involved in the day-to-day operation of the Haagen Dazs business tie her to the alleged misrepresentations and omissions. And, with regard to the *Businessweek* quotation, there is no evi-

dence that the Dubravetzes relied on this representation in buying their franchise.

Other evidence, however, is sufficient to create a genuine issue of material fact as to Hurley's liability. Hurley swore to the truth of Haagen Dazs's offering circulars and these circulars contained information as to the start-up costs of a Haagen Dazs franchised ice cream shop, information which, according to evidence presented by the Dubravetzes, was false. A jury could infer that Hurley either knew that the start-up cost figures were false, or that she lacked sufficient information to swear to their accuracy, notwithstanding her deposition testimony that she believed the figures in the offering circulars were true based on data she had collected.

A jury could also infer from the evidence presented by the Dubravetzes that Hurley participated in a conspiracy to supply them with misleading profitability information. *See Wyatt*, 157 Cal.Rptr. at 399, 598 P.2d at 52 (conspiracy in a fraudulent scheme "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances"). Tacit consent is enough to prove a conspiracy against a director or officer of a corporation, so long as the director or officer "concurred in the tortious scheme with knowledge of its unlawful purpose." *Id.; Pacific Tel. & Tel. Co. v. MCI Telecommunications Corp.*, 649 F.2d 1315, 1319 (9th Cir. 1981).

In sum, the Dubravetzes' evidence is sufficient to raise genuine issues of material fact as to the extent of Hurley's knowledge and approval of Paley's alleged misrepresentations and omissions, and as to the extent of her participation in the distribution of allegedly false profitability information.[2]

## C. Breach-of-Contract Claim

The Dubravetzes contend that the defendants breached an oral agreement to reserve certain flavors of ice cream exclu-

sively for the franchised shops and not to distribute these flavors to supermarkets and convenience stores. Pursuant to the parties' choice-of-law provision in their franchise agreement, we apply New York law to resolve this issue.

The written franchise agreement contains an integration clause, and specifically provides that Haagen Dazs had the unqualified right to sell products not only through its franchises but through any other distribution method. Parol evidence of a contrary prior oral agreement is barred by New York law. *Marine Midland Bank–Southern v. Thurlow*, 53 N.Y.2d 381, 442 N.Y.S.2d 417, 419, 425 N.E.2d 805, 807 (1981).

The Dubravetzes also argue that breach of the asserted oral agreement violated the covenant of good faith and fair dealing implied in their franchise agreement. The asserted oral agreement, however, is contrary to the explicit rights of the defendants under the franchise agreement. The Dubravetzes cannot claim a breach of the implied covenant of good faith and fair dealing when the expressed intention of the contracting parties is clear from their contract and is contrary to the covenant the Dubravetzes contend was violated. *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1157 (S.D.N.Y.1989) (applying New York law).

We conclude there is no merit to the Dubravetzes' breach-of-contract claim.

## D. Successor Liability

The Dubravetzes argue that when Pillsbury acquired Haagen Dazs it became liable for the alleged Haagen Dazs misrepresentations and omissions through the doctrine of successor liability.

Although the parties' franchise agreement contains a choice-of-law provision requiring the application of New York law to questions involving the interpretation or enforcement of that agreement, we consid-

---

**2.** We express no opinion on the truth or falsity of the profitability information supplied to the Dubravetzes.

er the successor liability issue under California law, because the issue does not involve the interpretation or enforcement of the franchise agreement. The parties do not dispute this. Under California law,

> a corporation which purchases the principal assets of another does not assume the liability of the selling corporation unless (1) there is an express or implied agreement of assumption of liability, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability. *Ray v. Alad Corp., supra,* [19 Cal.3d 22], 136 Cal.Rptr. [574] at 578, 560 P.2d [3] at 7 [1977]. In *Ray v. Alad Corp.,* the California Supreme Court created, in effect, a fifth exception to the general rule which imposes liability under certain circumstances for the manufacture of defective products.

*Gee v. Tenneco, Inc.,* 615 F.2d 857, 863 (9th Cir.1980). The Dubravetzes argue that Pillsbury either expressly or impliedly agreed to assume Haagen Dazs's liability for their claims, or that the *de facto* merger doctrine applies.[3]

1. Express or Implied Agreement to Assume Liability

■ The Dubravetzes' contention that Pillsbury expressly assumed Haagen Dazs's liabilities to franchisees arising out of tort claims is belied by the facts. The acquisition agreement between Pillsbury and Haagen Dazs expressly limits Pillsbury's obligations to the "leases, agreements, contracts, plans and commitments" listed in the balance sheet, and "all other agreements and contracts entered into in the ordinary course of business at any time

prior to the Closing." Although the Dubravetzes argue that the sale of franchises was "unquestionably the core of [Haagen Dazs's] business," this fact does not transform Haagen Dazs's alleged fraud on the Dubravetzes into an agreement, plan, commitment or contract made in the ordinary course of business, for which Pillsbury assumed liability.

The Dubravetzes also point to a Pillsbury post-acquisition statement to the California Department of Corporations indicating that "the business, assets and liabilities of Haagen Dazs Franchise, Inc. were acquired by the Haagen Dazs Shoppes, Inc., a wholly owned subsidiary of the Pillsbury Company of Minneapolis, Minnesota." They contend that this statement shows Pillsbury's implied intent to assume Haagen Dazs's tort liability. We reject this argument.

Pillsbury's assumption of liabilities is expressly and carefully set forth in the acquisition agreement. It is implausible that Pillsbury reversed this position and gratuitously agreed to assume Haagen Dazs's tort liabilities and that it chose to do so by expressing this reversal of position by the terse statement it made to the California Department of Corporations. *See Eastman Kodak Co. v. Image Technical Services,* — U.S. —, —, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) (requiring that "the nonmoving party's inferences be reasonable in order to reach the jury"). Moreover, in considering the effect of a similar statement Pillsbury made to the Washington Department of Corporations in another case involving a claim against Pillsbury for successor liability in its acquisition of Haagen Dazs, a district court in Minnesota concluded that "[i]n light of the specific

---

**3.** The Dubravetzes also contend the district court granted summary judgment against them on the successor liability issue without giving notice it intended to consider this issue. They argue that this *sua sponte* ruling deprived them of a fair hearing in opposition to the summary judgment motion.

We need not decide whether the Dubravetzes had sufficient notice that in ruling on the summary judgment motion the district court intended to consider the successor liability issue, or

whether if the court held a *sua sponte* hearing on this issue, it erred in so doing. We have independently reviewed the record and have considered not only the arguments the Dubravetzes made to the district court, but the arguments and the evidence on which they rely as set forth in their briefs and in oral argument to this court. Having considered such arguments and evidence, we have concluded that the Pillsbury defendants are entitled to summary judgment on the successor liability issue.

language of the [Pillsbury–Haagen Dazs acquisition] agreement, the evidence presented by plaintiffs is not sufficient to create a genuine issue of fact about whether Pillsbury assumed liability for any prior breaches of the franchise agreements by [Haagen Dazs]." *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 813 (D.Minn.1989). This analysis applies with equal force here.

### 2. *De Facto* Merger

■ The *de facto* merger doctrine applies under California law when "one corporation takes all of another's assets without providing any consideration that could be made available to meet claims of the other's creditors" or when "the consideration consists wholly of shares of the purchaser's stock which are promptly distributed to the seller's shareholders in conjunction with the seller's liquidation." *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 578, 560 P.2d 3, 7 (1977). Pillsbury's acquisition of Haagen Dazs does not meet these conditions.

The Dubravetzes contend, nevertheless, that a *de facto* merger occurred. They rely on *Marks v. Minnesota Mining and Manufacturing Company,* 187 Cal.App.3d 1429, 232 Cal.Rptr. 594 (1986).

The *Marks* court discussed appropriate inquiries to be made to determine whether a transaction "cast in the form of an asset sale actually achieves the same practical result" as a merger:

> (1) was the consideration paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller?

*Id.* 232 Cal.Rptr. at 598.

In *Marks,* the seller corporation received shares of the buyer corporation's stock in exchange for all its business assets and goodwill, including the corporate name and its shares of stock of its foreign subsidiary. The seller was required to change its name, distribute the buyer's stock to its shareholders and dissolve as soon as possible. All of the seller's employees, including its seven shareholders, were requested to sign employment agreements with the buyer. All five founders of the seller continued to work for the buyer in substantially the same capacity. Finally, all the seller's shareholders became shareholders of the buyer. *Id.* 232 Cal.Rptr. at 598. Under these facts, the *Marks* court concluded there was a *de facto* merger.

The case at bar is distinguishable. Here, the Haagen Dazs acquisition was accomplished through an arms-length cash transaction. There was no transfer of stock. The acquiring corporation bought the seller's assets and assumed certain contractual liabilities. The Haagen Dazs shareholders did not become shareholders of Pillsbury or any of its subsidiaries. The result of the transaction was far different from what the *Marks* court concluded was "exactly that which would have occurred had a statutory merger taken place." *Id.* 232 Cal. Rptr. at 599. No *de facto* merger occurred.

### E. New York Franchise Sales Act

■ The Dubravetzes contend the district court improperly granted summary judgment on their claim brought under the New York Franchise Sales Act, New York General Business Law § 680 et seq. ("the Act").

By its terms, the Act applies only when a person offers to sell or sells a franchise in New York. N.Y.Gen.Bus.Law § 683(1) (1991). The Act defines an offer or sale made in the state:

> (a) An offer or sale of a franchise is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state, or, if the franchisee is domiciled in this state, the franchised business is or will be operated in this state.
>
> (b) An offer to sell is made in this state when the offer either originated from this state or is directed by the offeror to this state and received at the place to which it is directed. An offer to sell is accepted in this state when acceptance is

communicated to the offeror from this state.

N.Y.Gen.Bus.Law § 681(12).

The parties agree that no part of their transaction occurred in New York, that the Dubravetzes are California residents, and that their franchised ice cream shop was located in California. The offeror, Haagen Dazs, was a New York corporation, but under the Act this circumstance is irrelevant. Thus, based on these facts, it would appear that the New York Franchise Sales Act has no application to this case. But there is more. The franchise agreement provides:

> It is mutually understood and agreed that this Franchise *shall be deemed to have been made in the State of New York, County of Bronx,* and that any and all performance thereunder, or breach thereof shall be interpreted, governed and construed pursuant to the laws of the State of New York, and that the parties consent that New York State shall be a forum where any cause of action arising under this franchise may be instituted.

Franchise Agreement (emphasis added).

The interpretation of the parties' franchise agreement is governed by New York law. Under New York law, "when parties set down their agreement in a clear and complete manner, it should be enforced according to its terms." *Serna v. Pergament Distribs.*, 582 N.Y.S.2d 550, 552 (App.Div.1992). "Extrinsic evidence is generally inadmissible to add to or vary the agreement." *Id.*

Haagen Dazs and the Dubravetzes "deemed" their agreement to have been made in New York. It is a "fundamental premise of contract law that contracts should be enforced according to their terms." *Id.* There is nothing ambiguous about the "deemed" language. Thus, under New York law extrinsic evidence of the parties' intent is inadmissible.

The defendants argue that the "deemed" language is boilerplate language which was inserted in the franchise agreement merely to express the choice of law provision. *Cf. Mon–Shore Management, Inc. v. Family Media, Inc.*, 584 F.Supp. 186, 193 (S.D.N.Y. 1984) (nearly identical language in choice of law provision). But, even if this were so, New York law prohibits us from looking beyond the plain words of the contract to construe this unambiguous language. Moreover, the franchisor was a New York corporation. It drew the contract. It is disingenuous for it now to argue that a provision it inserted into the agreement deeming the contract to have been made in New York does not mean what it plainly says.[4]

■ We conclude that the New York Franchise Sales Act applies to the Dubravetzes' purchase of their franchise. Applying our analysis of the successor liability doctrine, however, neither Pillsbury nor its subsidiaries, the Haagen Dazs Shoppes Company, Inc. or the Haagen Dazs Company, Inc., is liable for the alleged violation of the Act. *See Carlock*, 719 F.Supp. at 813. Because we can affirm the district court on any ground having support in the record, *Kruso*, 872 F.2d at 1421, we affirm the district court's summary judgment in favor of these Pillsbury defendants on the Dubravetzes' New York Franchise Sales Act claim. As to HDF Liquidating Corp. and Doris Mattus Hurley, the district court's summary judgment in their favor on this claim is reversed.

## CONCLUSION

We reverse the summary judgment in Hurley's favor on the fraud claim. We also reverse the summary judgment in favor of Hurley and HDF Liquidating Corp. on the Dubravetzes' claim under the New York Franchise Sales Act. We affirm the summary judgment in favor of Hurley and HDF Liquidating Corp. on the breach-of-contract claim. We affirm the summary judgment in favor of Pillsbury and its sub-

---

**4.** The parties have not raised the issue of mutual mistake, and we express no opinion on that matter.

sidiaries on all claims asserted by the Dubravetzes.

The Pillsbury defendants shall have and recover their costs on appeal from the Dubravetzes. The Dubravetzes shall have and recover 75% of their costs on appeal from Hurley, and shall bear the remaining 25% of their costs. Hurley and HDF Liquidating Corp. shall each bear their own costs on appeal.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings as to the Dubravetzes' claims against Hurley and HDF Liquidating Corp. for fraud and for the alleged violation of the New York Franchise Sales Act.

